

DA 09-0598

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 103

JOHN H. CONWAY and HAZEL A. CONWAY,

      Plaintiffs and Appellees,

   v.

ANITA R. MILLER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
               In and For the County of Lake, Cause No. DV 08-183
               Honorable C.B. McNeil, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Edward P. Nolde, Snyder Law Office, P.C., Bigfork, Montana

      For Appellee:

          Keith W. McCurdy, McCurdy Law Firm, P.C., Polson, Montana

Submitted on Briefs:  March 24, 2010

Decided:  May 5, 2010

Filed:

_____
                     Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 John and Hazel Conway moved for summary judgment, asserting that a building restriction line depicted on Anita Miller's lot on the Redgate Vista subdivision plat restricted where she could build her garage. The Twentieth Judicial District Court, Lake County, granted the Conways' motion for summary judgment, concluding that the plain language of the plat clearly restricted the building's location, and ordered Miller to remove a portion of her garage.

## BACKGROUND

¶2 John and Hazel Conway own Lots 5 and 6 of Redgate Vista, a platted subdivision in Lake County, Montana. Anita Miller owns the adjoining Lots 7 and 8. The plat of the Redgate Vista subdivision shows a line running north and south across Miller's Lot 7 labeled "building restriction line." The following figure is a copy of the plat showing the configuration of the lots and the building restriction line.



¶3 In 1973, Red Gate, Inc. surveyed and platted the Redgate Vista subdivision. All of the deeds in the chain of title for Lots 5, 6, 7, and 8 expressly referred to the plat depicted above. None of the deeds in the Conways' chain of title mention any easements or the building restriction line. The building restriction line is mentioned in Miller's chain of title. The deed from Red Gate, Inc. to Leland and Judy Hylsop and the deed from the Hylsops to the Walls contain the language: "Also, subject to a building restriction line on Lot Seven (7) according to the Plat of Red Gate Vista." The deed from the Walls to Smudge, Inc. conveys the property in fee simple, "except easements, restrictions, reservations and conditions of record." The deed from Smudge, Inc. to the Youngs has no mention of an easement or building restriction line. The deed from the Youngs to Alvie and Anita Miller conveys the property "subject to and together with rights of way and easements established or of record." Finally, the quitclaim deed from Alvie Miller to Anita Miller does not mention an easement or a building restriction line.

¶4 Exception 11 in Miller's title insurance policy to Lots 7 and 8 is the "building restriction line across said Lot 7, as shown on the Plat of Redgate Vista on file in the office of the Clerk and Recorder of Lake County, Montana." Miller admitted that the closing documents made her aware of the building restriction line prior to purchasing Lot 7.

¶5 In April 2008, Miller began constructing a garage located on both sides of the building restriction line. In May, the Conways filed their complaint, requesting in pertinent part that the court enjoin Miller from finishing construction of her garage and order her to remove the portion that violated the building restriction line. In November, the Conways

3

filed a motion for summary judgment, arguing that a reasonable interpretation of the plain language "building restriction line" on the plat led to the conclusion they were entitled to judgment as a matter of law because it was undisputed that the garage was located on both sides of the building restriction line.

¶6 Miller filed a cross-motion for summary judgment and asserted that, although the Conways failed to frame their argument as enforcement of an easement, this is in fact what they sought from the court. Miller argued that because the Conways were strangers to the deed, an easement was not created because it failed to have express language of the grantor's intent to create an easement. Relying on *Blazer v. Wall*, 2008 MT 145, 343 Mont. 173, 183 P.3d 84, Miller also asserted that the language "building restriction line" did not create an easement because it did not identify the dominant and servient tenement nor did it give the servient tenement knowledge of its use and necessity.

¶7 The District Court granted summary judgment in favor of the Conways. Without addressing whether an easement was created, the court adopted the Conways' arguments and concluded that, "[Miller] herself is charged with knowledge of the building restriction by virtue of the recorded plat and the special exception to the title policy obtained upon the purchase of her Lot 7." The court rejected Miller's argument regarding identification of the dominant and servient tenement because it was not supported by authority. The court also rejected her argument regarding the use and necessity of the building restriction line because it had "no difficulty concluding from the face of the plat that the restriction is to prohibit buildings on that portion of Lot 7 west of [the building restriction] line."

4

¶8  On appeal, Miller reasserts her argument that the language "building restriction line" is not adequate to create an easement because it does not identify a dominant and servient tenement and does not give her knowledge of the use and necessity of the easement. She also claims that the Conways extinguished the easement when they built their privacy fence because the fence obstructs their view, and the Conways contend the purpose of the building restriction is to protect their view. Finally, Miller argues that removing her garage is an idle act prohibited by § 1-3-223, MCA, because the Conways' view would still be obstructed by her house even if her garage was removed.

¶9  The Conways argue that *Blazer* is distinguishable and the language "building restriction line" clearly gives Miller notice that she cannot build on that portion of Lot 7 and that the District Court's ruling and order to remove the garage was correct.

¶10  We restate the issues on appeal as:

¶11  Issue 1: Did the plat's depiction of the "building restriction line" create a negative easement?

¶12  Issue 2: Did the Conways extinguish the negative easement by building a privacy fence?

¶13  Issue 3: Did the District Court err in ordering removal of Miller's garage because it would be a waste of resources?

## STANDARD OF REVIEW

¶14  We review a district court's denial of motions for summary judgment de novo. *Tacke v. Energy West, Inc.,* 2010 MT 39, ¶ 16, 355 Mont. 243, ___ P.3d ___. We review a

5

district court's conclusions of law to determine whether they are correct and its findings of fact to determine whether they are clearly erroneous. *JTL Group, Inc. v. New Outlook, LLP*, 2010 MT 1, ¶ 29, 355 Mont. 1, 223 P.3d 912.

## DISCUSSION

¶15 *Issue 1: Did the plat's depiction of the "building restriction line" create a negative easement?*

¶16 Miller's argument that the description on the plat was insufficient to create an easement is two-fold. First, she asserts that no easement was created because the language "building restriction line" does not clearly and unmistakably communicate the grantor's intent to create an easement, according to our easement-by-reference rules set forth in *Blazer*. Second, she contends that the Conways are strangers to the deed and, as such, the easement-by-reference doctrine does not apply. Miller claims that because the deed did not have any language creating an easement, none was created.

*A. The developer's intent to create a negative easement is clear and unmistakable.*

¶17 An easement by reservation must arise from the written documents of conveyance. *Halverson v. Turner*, 268 Mont. 168, 172, 885 P.2d 1285, 1288 (1994).

> A "negative easement" is one the effect of which is not to authorize the doing of an act by the person entitled to the easement, but merely to preclude the owner of the land subject to the easement from doing that which, if no easement existed, he would be entitled to do.

*Northwestern Improvement Co. v. Lowry*, 104 Mont. 289, 301, 66 P.2d 792, 794 (1937). A grantor may expressly reserve an easement over granted land in favor of retained land by

6

using appropriate language in the instrument of conveyance. *Blazer*, ¶ 27. An easement may be expressly reserved by referring in the instrument of conveyance to a recorded plat or certificate of survey on which the easement is adequately described. *Id*. When land is sold with reference to a properly recorded plat, the plat becomes part of the document conveying the interest in land. Section 76-3-304, MCA; *Benson v. Pyfer*, 240 Mont. 175, 179, 783 P.2d 923, 925 (1989).

¶18     None of the deeds at issue contain language creating a negative easement. The parties do not dispute this matter. The parties also do not dispute that the deeds expressly refer to a recorded plat. Thus, we look to the description on the plat rather than the language of the deed to determine if an easement was created and is enforceable.

¶19     An easement created by reference in an instrument of conveyance to a plat is an express easement. The intent to create an easement must be clearly and unmistakably communicated on the referenced plat using labeling or other express language. *Blazer*, ¶ 43. For an easement to be created by reference to a plat, it must be adequately described by being clearly depicted and labeled on the plat. *Id*. An easement has not been adequately described "when the identity of the dominant tenement has been omitted and cannot be ascertained from the documents of conveyance." *Blazer*, ¶ 51. In other words, an easement is not adequately described if the identities of the dominant and servient tenements are not ascertainable with "reasonable certainty" from the referenced plat or certificate of survey. *Blazer*, ¶ 54.

7

¶20 An adequate description of an easement also gives the servient tenement knowledge of its use or necessity. *Blazer*, ¶ 36. For example, we held that the depiction and labels of a "public utility easement" and a "private roadway easement" on a certificate of survey was adequate to create an easement by reference. *Bache v. Owens*, 267 Mont. 279, 286, 883 P.2d 817, 822 (1994). And again in *Halverson*, we held that an easement labeled "30-foot road easement" between two tracts of land depicted on a certificate of survey was sufficient to create an easement by reference. *Halverson*, 268 Mont. at 174, 885 P.2d at 1289.

¶21 On the other hand, an easement may not be inferred or implied from an unlabeled or inadequately described depiction appearing on a plat or certificate of survey. *Blazer*, ¶ 43. For example, in *Tungsten Holdings, Inc. v. Parker*, the plat depicted a narrow, meandering tract of land labeled "lot 34." *Tungsten Holdings, Inc. v. Parker*, 282 Mont. 387, 388-89, 938 P.2d 641, 641-42 (1997). We reversed the district court's conclusion that a road easement was created, explaining that "easements by reservation must be created or reserved in writing." *Tungsten Holdings*, 282 Mont. at 390, 938 P.2d at 643. Because nothing specifically identified lot 34 as a roadway, we held no easement was created. *Id.*

¶22 Finally, while a plat's or certificate of survey's description are strong considerations in determining the grantor's intent to create an easement, we must consider the entire instrument, including both the deed and the entire plat. "The modern conception of conveyancing, however, seeks to ascertain the intent of the grantor from a consideration of the entire instrument, without regard to the position of the several clauses . . . ." *City of Missoula v. Mix*, 123 Mont. 365, 370, 214 P.2d 212, 215 (1950).

¶23     While Miller admits she knew about the existence of the building restriction line before she bought Lot 7, she contends that the description is inadequate to create an easement because no dominant and servient tenement is identified nor can she decipher the use or necessity of the negative easement. She claims the language is too ambiguous to determine what type of building is restricted and the description fails to give the purpose of the restriction.

¶24     Citing *Pearson v. Virginia City Ranches Ass'n*, 2000 MT 12, 298 Mont. 52, 993 P.2d 688, the Conways respond that because the subdivision plat of Redgate Vista was incorporated into all of the deeds in Miller's and the Conways' chain of title, Miller is bound by the building restriction line. According to the Conways, the right to enforce the negative easement created by the building restriction line belongs to all affected owners of lots in Redgate Vista.

¶25     Miller's reliance on and interpretation of *Blazer* is misplaced. Nothing in *Blazer* stands for the proposition that the dominant and servient tenement must be expressly labeled as such for the easement to be adequately described. And while *Blazer* presents a thorough review of the easement-by-reference rules and pertinent case law, we cannot rely solely on *Blazer* for our analysis because it is factually distinguishable. Not only was a portion of the purported dominant tenement in *Blazer* not even included on the certificate of survey, the alleged road easement terminated off the certificate of survey. *Blazer*, ¶¶ 3, 9. These facts weighed heavily in reaching the conclusion that neither the use or necessity of the easement could be determined nor could the dominant and servient tenements. *Blazer*, ¶¶ 53, 57.

Another important distinction between *Blazer* and the case at hand is that the parcels of land in *Blazer* were not in a platted subdivision. *See Blazer*, ¶ 2.

¶26 The process surrounding subdivisions is controlled by the Montana Subdivision and Platting Act. Section 76-3-304, MCA, provides in part:

> The recording of any plat made in compliance with the provisions of this chapter shall serve to establish the identity of all lands shown on and being a part of such plat. Where lands are conveyed by reference to a plat, the plat itself or any copy of the plat properly certified by the county clerk and recorder as being a true copy thereof shall be regarded as incorporated into the instrument of conveyance and shall be received in evidence in all courts of this state.

We determined this statute stood for the proposition: "[W]here land is sold with reference to a map or plat showing a park or like open area, the purchaser acquires a private right, generally referred to as an easement, that such area shall be used in the manner designated." *Pearson*, ¶ 19. In addition, we said that "an easement arises when a purchaser's deed refers to a plat where an easement is depicted and labeled." *Pearson*, ¶ 26.

¶27 Considering all of the instruments of conveyance, the easement-by-reference rules from *Blazer*, § 76-3-304, MCA, and *Pearson*, we determine that Red Gate, Inc. intended to create a negative easement restricting building on the western portion of Lot 7. We reach this conclusion after examining a number of factors. First, when Red Gate, Inc. platted the subdivision, not only did it draw and label the building restriction line on the plat of Redgate Vista, it referenced it in its deed to the Hylsops. While we agree that "subject to" does not create an easement by itself, s*ee Blazer*, ¶¶ 28-29, we cannot ignore it as evidence of the grantor's intent to restrict building.

10

¶28 Second, at the very least, the plat provided sufficient information to put Miller on inquiry notice. "Knowledge of the existence of a claim will be imputed to a party who has sufficient information to put it on inquiry notice of that claim." *Halverson*, 268 Mont. at 173, 885 P.2d at 1288. It was Miller's responsibility to conduct an official inquiry into the extent of the negative easement rather than simply ignore the building restriction line on the plat and proceed with construction, giving rise to litigation to determine the extent of the restriction after she had expended money and resources.

¶29 Third, the description of the building restriction line was express enough to give Miller knowledge of the negative easement's use and necessity. The only interpretation of the plain language of "building restriction line" is that the servient tenement owner cannot construct any structure on the western portion of Lot 7. We reject Miller's argument that the plat must provide a purpose for the easement. The use—or "non-use" in the case of a negative easement—is that building in that location is prohibited, whether to protect a view or to prevent building on a steep slope. If Red Gate, Inc. wanted to only restrict the building of two-story homes, six foot fences, or dog runs, it would have said as much on the plat. Nonetheless, from the label on the plat we conclude that Red Gate, Inc. intended to restrict any and all building in that area, for whatever reason.

¶30 Finally, we can determine to a reasonable certainty the dominant and servient tenements of the Redgate Vista subdivision from the instruments of conveyance. All of the properties in question were sold with reference to a plat that included the building restriction line. According to our interpretation of § 76-3-304, MCA, in *Benson* and *Pearson*, the

11

purchasers of the lots in the Redgate Vista subdivision acquired a private right to have Lot 7 used in the manner designated. Thus, the negative easement was created for the benefit of all of the lot owners. Moreover, we can see no logical reason that negative easements should be treated differently than improvements on the property, such as parks and open areas, if the purpose of the statute is to ensure that purchasers of the properties in the subdivision essentially get what they pay for. *See Benson*, 240 Mont. at 179, 783 P.2d at 925-26 (interpreting § 76-3-304, MCA, to create an easement for the benefit of purchasers of subdivision lots so they could recover for fraudulent misrepresentations made by sellers).

¶31 In sum, the description "building restriction line" on the plat of the Redgate Vista subdivision clearly created a negative easement in favor of the Conways that restricts any building on the western portion of Miller's Lot 7. The District Court did not err in concluding that Miller was prohibited from building in that area.

*B. The Conways are not strangers to the deed.*

¶32 Miller also argues that because the Conways are not parties in any conveyance to Miller or any conveyance in her chain of title, they are strangers to the deed. According to Miller, as strangers to the deed, the Conways failed to carry their burden to show the developer's intent to create an easement.

¶33 Strangers to the deed are those who are not parties to it. *Loomis v. Luraski*, 2001 MT 223, ¶ 29, 306 Mont. 478, 36 P.3d 862.

> A reservation of an interest in real property, to be good, must be made to all, some, or one of the grantors, and not to a stranger to the deed. The basis for this view is the ancient rule that words of reservation, (or exception), are not

12

> words of a grant and are ineffective to convey a right or interest to a stranger to a deed.

23 Am. Jur. 2d *Deeds* § 68 (2002). Although transactions involving a stranger to the deed are disfavored, where the intent of the grantor to reserve an interest in property to a stranger is clearly shown, we will give effect to the grantor's intent. *Loomis*, ¶¶ 31-32.

¶34 When Red Gate, Inc. conveyed the lots at issue in 1973, it reserved the negative easement restricting building on Lot 7. Red Gate, Inc. conveyed its interest in Lot 7 to the other owners in the subdivision. At no point were any rights conveyed to an unrelated party. The Conways are not strangers to the deed.

¶35 Miller's last two issues—whether the Conways extinguished the easement by building a privacy fence and whether destruction of Miller's garage is a waste of resources—are based on the presumption that the purpose of the easement is to protect the Conways' view. Nothing in the record shows that the purpose of the easement is to protect the view. We will not address arguments that are not supported by the record. *Richards v. JTL Group, Inc.*, 2009 MT 173, ¶ 38, 350 Mont. 516, 212 P.3d 264 (citing M. R. App. P. 12(1)). The District Court did not err when it ordered Miller's garage removed.

## CONCLUSION

¶36 The instruments of conveyance clearly and unmistakably show Red Gate, Inc.'s intent to create a negative easement that restricts building on the western portion of Miller's Lot 7 for the benefit of the lot owners of the Redgate Vista subdivision. The easement is

13

enforceable by the Conways and the District Court did not err in ordering Miller's garage removed.

¶37    Affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

Justice James C. Nelson, dissenting.

¶38    I dissent. While the Court recites the correct standards for creating an easement under our easement-by-reference doctrine (*see* Opinion, ¶¶ 19-21), I believe the Court misapplies those standards in the present case.

¶39    It is a fundamental tenet of property law that an intention to convey or create a particular interest in real property must be clearly expressed in writing (except where the interest arises by operation of law, which is not the case here). *Blazer v. Wall*, 2008 MT 145, ¶ 69, 343 Mont. 173, 183 P.3d 84; § 70-20-101, MCA. Typically, a seller of land grants or reserves an easement by the use of express words, such as "The Seller hereby reserves an easement 30 feet in width along the northern boundary of the Buyer's property for purposes of ingress to and egress from the Seller's retained property identified as follows . . . ." *See*

14

§ 70-20-103, MCA. Our easement-by-reference doctrine, however, is premised on the notion that a seller may express her intent to grant or reserve an easement through the use of a depiction on a plat or certificate of survey referenced in the instrument of conveyance. We have emphasized, though, that the intent to create an easement burdening particular property for the benefit of another must be "clearly and unmistakably communicated." *Blazer*, ¶ 43; *Broadwater Development, LLC v. Nelson*, 2009 MT 317, ¶ 27, 352 Mont. 401, 219 P.3d 492.

¶40    In this regard, even though it may appear from the referenced plat or certificate of survey that the seller intended to create some sort of easement, the critical issue is whether the seller actually accomplished that result under the law. In point of fact, a seller *must* comply with certain requirements for establishing an easement. Indeed, that was the primary point of our decisions in *Blazer* and *Tungsten Holdings, Inc. v. Parker*, 282 Mont. 387, 938 P.2d 641 (1997). In *Blazer*, the certificate of survey depicted a strip labeled "30' EASEMENT ROAD," which indicated an intent to create a 30-foot-wide easement road. The problem was that the use or necessity of the open-ended road and the intended dominant and servient tenements were not ascertainable with reasonable certainty from the certificate of survey. Accordingly, the depiction failed to create the purported easement. *See Blazer*, ¶¶ 54, 57, 75. Likewise, in *Tungsten Holdings*, the plat depicted a meandering strip of land 40 feet wide and approximately 2,700 feet long, which was identified as "lot 34." This parcel resembled a roadway, and the district court found that there was "no other conceivable purpose" a parcel of this configuration could reasonably serve. The court also found that without a roadway in this location, a number of lots would be landlocked and inaccessible.

15

Notably, the tax deed for lot 34 contained the notation "ROAD" in the property description. Nevertheless, this Court, speaking through Justice Leaphart, held unanimously that the mere fact that a depiction on a plat may appear to be a roadway, or that the developers may have intended it to be a roadway, is simply *not* sufficient to establish the easement. The developers had to express this intent *in writing*. *Tungsten Holdings*, 282 Mont. at 390, 938 P.2d at 642-43. Thus, in both cases, we held that whatever the sellers or developers may have intended, their depictions were inadequate to establish a valid and enforceable easement because the depictions did not adequately impart the requisite information for creating an easement.

¶41 To create an express easement, the documents of conveyance must identify the grantor and the grantee, adequately describe what is being conveyed, contain language of conveyance, and be signed. *Broadwater Development*, ¶ 27. Focusing on the second of these requirements, a property description is a necessary inclusion in the instrument conveying title so that the extent of the claim to the property may be determined. *Halverson v. Turner*, 268 Mont. 168, 172, 885 P.2d 1285, 1288 (1994). Consequently, an inadequate or defective property description is ineffective to create or transfer a property interest. *Blazer*, ¶¶ 70-71. Under our easement-by-reference doctrine specifically, a property description is inadequate (and thus ineffective) if an individual examining the referenced plat or certificate of survey cannot ascertain, with reasonable certainty, (1) the identities of the dominant and servient tenements (i.e., what property the depicted easement benefits and what property it burdens), and (2) what the easement's use or its necessity is. *Broadwater Development*,

16

¶ 38. We agreed unanimously in *Blazer* that these two requirements must be satisfied in order to create the easement. *See Blazer*, ¶¶ 51, 67 (opinion of the Court); *Blazer*, ¶ 80 (dissenting opinion) ("The Court correctly determines that an easement-by-reference fails if it does not depict and identify both the dominant and servient tenements, as we have held repeatedly that 'it is necessary that the grantee of the property being burdened by the servitude have knowledge of its use or its necessity.' "). Neither of these requirements is satisfied in the present case.

¶42    First, as to the identity of the dominant tenement, the Court relies on *Benson v. Pyfer*, 240 Mont. 175, 783 P.2d 923 (1989), and *Pearson v. Virginia City Ranches Assn.*, 2000 MT 12, 298 Mont. 52, 993 P.2d 688, for the proposition that the alleged building restriction on Lot 7 was "created for the benefit of all of the lot owners." Opinion, ¶ 30. The issue in *Benson*, however, concerned the installation of water and sewer facilities and paved streets, and there was no dispute that these were intended for the benefit of all lots in the subdivision. Likewise, *Pearson* concerned a bridle path easement crossing the subdivision, and we had no difficulty in determining from the depiction on the plat that this easement was intended for the use of all lot owners. But the same clear intent is not shown on the Redgate Vista plat, which simply depicts a line across Lot 7 labeled "Building restriction line":

17



REDGATE VISTA

NE¼ NE¼ SEC. 19, T.26N., R.19 W.

There is no indication on the plat as to what property or properties this restriction was intended to benefit—perhaps one or more subdivision lots, or maybe a neighboring property outside the subdivision. Nevertheless, the Court opines that in drawing the line across Lot 7, the developer intended one thing, and one thing only: to create legally enforceable rights in all other lot owners within Redgate Vista subdivision. Opinion, ¶ 30. However, if that is what was intended, I cannot agree that it is conveyed clearly and unmistakably on the plat. *Blazer*, ¶ 43.

¶43    The Court suggests that we should treat the building restriction line no differently than improvements such as parks and open areas because the purpose of § 76-3-304, MCA, is "to ensure that purchasers of the properties in the subdivision essentially get what they pay for." Opinion, ¶ 30. But this statement assumes the very issue we are deciding: Did the purchasers of Redgate Vista lots pay for an easement on Lot 7? Or, more to the point, did the developer intend to create legally enforceable rights in the subdivision lot owners concerning the use of Lot 7? In this regard, the Court's attempted analogy between the building restriction line and parks, open areas, and bridle path easements is unavailing. The intent to benefit all subdivision lot owners is reasonably clear where a park, an open area, or a bridle path easement is shown on a subdivision plat, but the same cannot be said of a single building restriction line drawn across one of the subdivision lots as in this case. For these reasons, I would hold that the identity of the dominant tenement is not ascertainable with reasonable certainty from the plat.

19

¶44 Turning to the identity of the servient tenement, we likewise lack necessary information. In particular, we do not know from the plat which side of the line the building restriction applies to. The line is labeled "Building restriction line" with an arrow pointing to the line, as follows:



The Court repeatedly assumes—without any analysis—that because the label "Building restriction line" is on the left (west) side of the line, the restriction must apply to that side of Lot 7. But the Court has no basis for making this assumption. In fact, the Court manufactures this rule from whole cloth. We have been provided with no evidence whatsoever that surveyors actually follow such a rule when drafting plats and certificates of survey. *Cf. Our Lady of the Rockies, Inc. v. Peterson*, 2008 MT 110, ¶ 32, 342 Mont. 393, 181 P.3d 631 (referring to the 1890 *Manual of Surveying Instructions for the Survey of the Public Lands of the United States and Private Land Claims*, provided by the parties

in that case, for purposes of interpreting the survey at issue). We have been given no guidance at all (not even in the form of an amicus curiae brief from a trade group or association) regarding the rules, customs, or practices, if any, that surveyors follow with regard to the positioning of labels on plats and certificates of surveys and whether the location of a line's label determines where a legally enforceable burden exists. What we have done, therefore, oblivious to the potential inaccuracy of our conclusion and to the utter absence of any supporting authority, is announce a rule that when the word "restriction" appears on a particular side of a line on a plat or certificate of survey, with an arrow pointing to that line, the restriction necessarily and only applies on that side of the line. I have no idea whether that was the practice followed by surveyors in 1973 when the Redgate Vista plat was created, and I have no idea whether that is the practice followed by surveyors today. What I do know is that our decision sets a dangerous precedent that may result in the creation or invalidation of untold easements based on this Court's new interpretational rule for which, as noted, there is neither any cited authority nor any foundation in the record.

¶45    Furthermore, even assuming, for the sake of argument, that there was a practice among surveyors in 1973 regarding the placement of line labels, how would an individual looking at the Redgate Vista plat know that? The Court suggests that the plat put Miller on "inquiry notice" and that she therefore had the responsibility "to conduct an official inquiry into the extent of the negative easement." Opinion, ¶ 28. Of course, it is axiomatic that a person need not inquire into the *extent* of an easement unless the easement is first determined

21

to be *valid*, and an ambiguous or nebulous line drawn on a plat or certificate of survey does not constitute a valid easement. *See Blazer*, ¶¶ 57-67; *Tungsten Holdings*, 282 Mont. at 390, 938 P.2d at 642-43. Moreover, it is not clear what the Court means by an "official inquiry" (as opposed to an "unofficial" one) and to whom the "official inquiry" would be directed. But, in any event, the only inquiry Miller was required by law to conduct (official or otherwise) was to examine the public records. Recall that the notice provisions of the recording statutes are designed to enable a prospective purchaser to determine what kind of title he or she is obtaining *without having to search beyond public records*. *Blazer*, ¶ 73. Miller was not required to track down extrinsic evidence about the meaning of the line over Lot 7. *See Blazer*, ¶ 71 (extrinsic evidence may not be admitted to complete a defective property description or to show the intention with which it was made). The documents of conveyance must impart the necessary information themselves, not only to satisfy the statute of frauds (§ 70-20-101, MCA), but also because "[g]ood-faith purchasers of real property . . . are entitled to rely on publicly recorded deeds, plats, and certificates of survey pertaining to the subject property to disclose accurately all encumbrances, easements, and impediments thereon." *Blazer*, ¶ 74. Thus, the validity of the easement depends on the adequacy of the depiction on the Redgate Vista plat itself; Miller had to go no further. And examining that plat, nothing on it enables a purchaser of Lot 7 to ascertain with reasonable certainty which side of the lot the building restriction applies to. Thus, the intent to create the restriction was not accomplished according to the requirements of law, and the negative easement fails.

22

¶46 In addition to the plat's failure to identify adequately the intended dominant and servient tenements, the use or necessity of the building restriction is also not ascertainable with reasonable certainty from the plat. Indeed, although the Court claims that "Building restriction line" has "only [one] interpretation," Opinion, ¶ 29, the fact is that the term is patently ambiguous. In fact, the Court's own analysis reflects this. Initially, the Court interprets "building" as a noun that prohibits the construction of any structures, but then the Court interprets "building" as a verb that prohibits the activity of building anything, including homes, fences, and dog runs. Opinion, ¶ 29.

¶47 In point of fact, a person examining the Redgate Vista plat simply cannot know whether "building restriction" is a prohibition on "buildings," a prohibition on the activity of "building," a restriction on height or type, or some other restriction. Perhaps a one-story structure is okay but a multi-story structure is not. What about a garage, or a shed, or a playhouse? Are things like fences, retaining walls, and wells permissible in the restricted area? What about landscaping? Can one install a jungle gym, or a brick barbeque, or a sandbox, or underground utilities?

¶48 There are countless plausible interpretations of the term "building restriction." Yet, in order to create a valid and enforceable negative easement, the law specifically requires the seller to express his intent clearly and unmistakably in the documents of conveyance, so that the purchaser of the servient property is given knowledge of the easement's use or its necessity and does not have to resort to her "common sense," subjective judgment, or inferences as to what the seller intended. *Blazer*, ¶¶ 51, 54; *Halverson*, 268 Mont. at 172,

23

885 P.2d at 1288; *Ruana v. Grigonis*, 275 Mont. 441, 447, 913 P.2d 1247, 1251 (1996). The reason for this requirement is obvious: The purchaser has a right to know—again, without having to rely on "common sense" or guesswork—the precise nature and extent of the burden imposed on her property. Here, the developer's intent regarding the use or necessity of the "Building restriction line" is not clearly and unmistakably expressed on the Redgate Vista plat—the Court's seemingly confident pronouncements about what the developer meant notwithstanding. Because the building restriction's use or necessity is not described adequately on the plat, the intent to create the restriction was not accomplished according to the requirements of law and the negative easement fails.

¶49    In sum, the "Building restriction line" on the Redgate Vista plat is ambiguous. As with the depictions in *Blazer* and *Tungsten Holdings*, the intended use or necessity of the alleged easement and the intended dominant and servient tenements are not ascertainable with reasonable certainty. The Court's contrary conclusion rests on sheer conjecture about what the developers intended and an interpretational rule that lacks any authority or foundation in the record. Where the requirements of the law are not met, as is the case here, the purported easement fails. I would reverse the District Court's decision.

¶50    I dissent.

/S/ JAMES C. NELSON

Justices Patricia O. Cotter and Jim Rice join in the Dissent of Justice James C. Nelson.

24

/S/ PATRICIA O. COTTER
/S/ JIM RICE